Andrew M. Calamari
Sanjay Wadhwa
Adam Grace
Alexander Janghorbani
Kristine M. Zaleskas
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281
(212) 336-0177 (Janghorbani)
Email: JanghorbaniA@sec.gov

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**SECURITIES AND EXCHANGE COMMISSION,**

**Plaintiff,**

**- against -**

**KALEIL ISAZA TUZMAN and ROBIN SMYTH**

**Defendants.**

---

**15 Civ. ______ ( )**

**ECF CASE**

## COMPLAINT

Plaintiff Securities and Exchange Commission (the "Commission"), for its complaint against defendants Kaleil Isaza Tuzman ("Isaza Tuzman") and Robin Smyth ("Smyth," and together with Isaza Tuzman, "Defendants"), alleges:

## SUMMARY OF ALLEGATIONS

1. This action involves a number of schemes by Isaza Tuzman and Smyth—the former chief executive officer and former chief financial officer, respectively, of KIT Digital, Inc. ("KIT Digital" or "Company")—to defraud the Company's investors and auditors by

materially misstating KIT Digital's financial statements and other public disclosures and engaging in accounting transactions that violated Generally Accepted Accounting Principles in the United States ("U.S. GAAP"). From approximately 2008 to 2012, Defendants knowingly or recklessly caused KIT Digital:

a. To falsely recognize approximately $1.5 million in revenue from the purported sale of a software product that KIT Digital never delivered and for which the customer never paid; and

b. To divert nearly $8 million that the Company had announced would be used to acquire another firm to create a slush fund to make a series of round-trip payments that resulted, among other things, in a phony reduction of receivables.

2. In addition, from late 2008 through 2011, KIT Digital and Isaza Tuzman:

a. Hid the fact they were aggressively trading KIT Digital stock on the open-market; and

b. Hid the loss of approximately $2 million in cash or cash equivalent with an offshore money-management firm.

3. As a result of their frauds, from approximately 2009 to mid-2012, KIT Digital filed with the Commission false and misleading Forms 10-Q, 10-K, and 8-K, and attendant financial statements, materially overstating revenue, goodwill, and cash equivalents and materially understating the Company's true losses by millions of dollars.

**VIOLATIONS**

4. By engaging in the conduct set forth in this Complaint, Defendants:

a. Violated Section 17(a) of the Securities Act of 1933 ("Securities Act") [15

U.S.C. § 77q(a)] and Sections 10(b) and 13(b)(5) of the Securities Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b) and 78m(b)(5)] and Rules 10b-5, 13a-14, 13b2-1, and 13b2-2 thereunder [17 C.F.R. §§ 240.10b-5, 240.13a-14, 240.13b2-1, and 240.13b2-2]; and

b. Aided and abetted KIT Digital's violations of Sections 13(a), 13(b)(2)(A), and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(a), 78m(b)(2)(A) and 78m(b)(2)(B)] and Rules 12b-20, 13a-1, 13a-11, and 13a-13 thereunder [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

**NATURE OF THE PROCEEDINGS AND THE RELIEF SOUGHT**

5. The Commission brings this action pursuant to the authority conferred upon it by Section 20(b) of the Securities Act [15 U.S.C. § 77t(b)] and Sections 21(d)(1) and 21(d)(5) of the Exchange Act [15 U.S.C. §§ 78u(d)(1) and 78u(d)(5)].

6. The Commission seeks a final judgment: (a) restraining and permanently enjoining Defendants from engaging in the acts, practices and courses of business alleged against them herein and from committing future violations of the above provisions of the federal securities laws; (b) ordering Defendants to disgorge any ill-gotten gains they received and to pay prejudgment interest thereon; (c) ordering Defendants to pay civil money penalties pursuant to Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)]; (d) barring Defendants from serving as officers or directors of a public company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section 21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)]; and (e) ordering such other and further relief as the Court may deem just and proper.

## JURISDICTION AND VENUE

7.      This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d),

22(a), and 22(c) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), 77v(a), and 77v(c)], Sections

21(d) and 27 of the Exchange Act [15 U.S.C. §§ 78u(d) and 78aa], and 28 U.S.C. § 1331.

8.      Venue lies in the Southern District of New York pursuant to Section 22(a) of the

Securities Act [15 U.S.C. § 77v(a)] and Section 27 of the Exchange Act [15 U.S.C. § 78aa].

Certain of the transactions, acts, practices, and courses of business constituting the violations

alleged herein occurred within the Southern District of New York; for instance, at all relevant

times, KIT Digital had its principal executive offices in New York City, its stock was either

quoted on the New York–based OTC Bulletin Board or listed on the NASDAQ stock exchange,

KIT Digital's registered public accounting firm was located in New York City, a number of KIT

Digital's shareholders were located in New York City, and KIT Digital's false and misleading

public filings were transmitted to the Commission from New York City.

9.      In connection with the transactions, acts, practices, and courses of business

alleged in this Complaint, Defendants directly or indirectly have made use of the means and

instrumentalities of interstate commerce, or of the mails, or of the facilities of a national

securities exchange.

## DEFENDANTS

10.      **Isaza Tuzman**, age 43, was the chief executive officer of KIT Digital from early

2008 through his termination in March 2012.  At all relevant times, Isaza Tuzman was a major

shareholder—directly or through companies that he owned—of KIT Digital's common stock.

11.      **Smyth**, age 61, was KIT Digital's chief financial officer from 2003 (beginning at

KIT Digital's predecessor, ROO Group) until mid-2012, with the exception of a brief period

from April to September 2009. In addition, during the relevant period, Smyth also served as KIT Digital's principal accounting officer (with the exception of the same brief period).

## RELATED ENTITY

12. **KIT Digital** was a public Delaware corporation with its principal executive offices in New York City, and other places of business in Dubai, United Arab Emirates, and Prague, Czech Republic. From May 2008 to approximately August 2009, KIT Digital's shares were quoted on the OTC Bulletin Board. From August 2009, the Company's shares were listed on the NASDAQ Stock Market under the symbol "KITD." Between 2009 and late 2011, the Company made several public offerings of stock, including offerings in August 2009, January 2010, April 2010, November 2010, and September 2011. The Company's shares were delisted from NASDAQ in late 2012.

## FACTS

### I. BACKGROUND

13. In early 2008, Isaza Tuzman became CEO of a company named ROO Group, which changed its name to KIT Digital, Inc., in approximately spring 2008. KIT Digital purported to sell software and services to assist video content providers in making their content accessible to viewers on the Internet and via internet-enabled television. During the period of conduct alleged herein, Defendants attempted to grow KIT Digital through acquiring a number of other technology companies as well as selling KIT Digital's products and services.

14. As a public company, KIT Digital had hired an independent registered public accounting firm to conduct annual audits and periodic reviews.

## II. KIT DIGITAL HIDES THE LOSS OF A $2 MILLION INVESTMENT

### A. KIT Digital's Cash Management Agreement with the Fund

15. In the months following his assumption of CEO duties at KIT Digital, Isaza Tuzman undertook efforts to increase his shareholding in the Company through his own private investment vehicles.

16. To achieve these ends, Isaza Tuzman actively solicited the financial and networking assistance of two individuals ("Individual A" and "Individual B"). In summer 2008, Individuals A and B helped raise millions of dollars so that Isaza Tuzman, either directly or through an entity he controlled, could exercise an option to purchase the majority of KIT Digital's shares.

17. In approximately August 2008, the Company agreed to a money management agreement with Individuals A and B. Pursuant to this agreement, KIT Digital agreed to deposit surplus cash in a fund (the "Fund"), which purported to be a cash management firm operated by Individuals A and B.

18. Under the terms of the cash management agreement, the Fund was supposed to trade or invest KIT Digital's money in low-risk financial market investments. In return, KIT Digital's deposit would earn annual interest. The Fund guaranteed KIT Digital's principal as well as the promised return. In addition, the cash management agreement provided that KIT Digital could withdraw its money within 14 days upon written demand.

19. In August 2008, KIT Digital wired a total of $6.5 million to the Fund. As of September 30, 2008, over 70% of the Company's cash was invested with the Fund.

**B. <u>The Fund Fails to Honor KIT Digital's Requests to Withdraw Its Cash.</u>**

20. Despite the purportedly low-risk nature of the investment and the terms of the cash management agreement, Isaza Tuzman quickly learned that the Fund was unable (or unwilling) to return all of KIT Digital's money when requested. On November 5, 2008, Isaza Tuzman requested the termination of KIT Digital's cash management agreement with the Fund and the return of $4.45 million, the entirety of KIT Digital's remaining investment, because of, in Isaza Tuzman's words, "unacceptable delays in receiving cash upon request[.]"

21. It was important to Isaza Tuzman that the Fund return KIT Digital's money quickly. On November 5, 2008, Isaza Tuzman emailed a KIT Digital director that:

> Auditors [a]re now inquiring regarding cash mgmt [management] . . . . Now they're inquiring about my business involvement with [the Fund]. This could be get [sic] very ugly, man. We need to unwind with [the Fund] . . . COMPLETELY."

22. However, the Fund did not honor this request in full, returning only $2.492 million (and thus leaving nearly $2 million of the Company's money trapped in the Fund). In addition, of the total payments purportedly made up to January 2009 by the Fund to KIT Digital, nearly $3 million was actually paid, not by the Fund, but by other parties acting on the Fund's behalf. This further demonstrated that the Fund itself was unable to repay KIT Digital's deposits on demand as promised. The Fund did not return any more cash to KIT Digital after mid-January 2009.

23. From that point on, Isaza Tuzman understood that KIT Digital could not quickly (if at all) redeem its remaining deposits from the Fund.

24. To provide at least some evidence that the obligation would eventually be repaid, the parties entered into a "security agreement and assignment of portfolio" ("Security Agreement"), in approximately April 2009. This Security Agreement purported to provide KIT

Digital with some collateral for the cash that the Fund was not repaying. Isaza Tuzman led KIT Digital's negotiations of the Security Agreement and was, therefore, fully aware of the terms of the agreement.

25. Pursuant to the Security Agreement, the Fund agreed that certain "publicly-traded securities," owned either by it or another entity, would be placed into a Trading Portfolio ("Trading Portfolio"). The Fund (and/or the other entity) then purported to transfer to KIT Digital its rights with respect to these securities in order to "guarantee the repayment of the deposits," up to the nearly $2 million that the Fund had not returned. In addition, the Security Agreement contained an "Exhibit A," which per the agreement's terms purported to be a list of the publicly-traded securities in the Trading Portfolio. Exhibit A appeared to be a list of foreign currency exchange contracts of some type. The Security Agreement purported to provide KIT Digital with collateral securing the Fund's obligation to repay the nearly $2 million owed to KIT Digital.

26. However, KIT Digital and Isaza Tuzman knew (or recklessly disregarded) that—despite the terms of the Security Agreement—at best, the nearly $2 million would be re-paid over time and not within 14 days. Isaza Tuzman understood that the Security Agreement did not actually give KIT Digital the ability to get its cash back quickly. For example, Isaza Tuzman understood that KIT Digital's attempts to redeem its deposits with the Fund would result, not in a quick return of the money, but rather a protracted dispute with the Fund (something he wanted to avoid). In summer 2009, he told another Company officer that he was concerned that attempting to redeem KIT Digital's investment in the Fund, "would end up in seizure of cash collateral and a big and angry pissing match with [Individual B]--which would effectively kill our public offering. It's a path of no return."

27.     Thus—while the Security Agreement created the appearance that the Company had not lost its $2 million—Isaza Tuzman understood that in reality the Company could not practically exercise its rights under the agreement or quickly get its cash back.

28.     In addition, in May 2009, the Company's Controller informed Isaza Tuzman that KIT Digital should not consider its remaining deposits at the Fund to be cash or cash equivalents even with the Security Agreement.  The Controller wrote Isaza Tuzman that:

> As of March 31, 2009, KIT has $524,000 classified as Cash, $2,000,000 classified as Cash Equivalents ([the Fund]) . . . .
>
> Before the 10-K was filed, a discussion with the auditors occurred in relation to the classification of the funds with [the Fund].  The auditors believe it should be classified as an investment and not as a cash equivalent.  We agreed to leave it as cash equivalent in the 10-K, with further explanation in the notes, and revisit the classification in the Q1 10-Q.
>
> The following is the definition of cash equivalents per FAS95, "Cash equivalents are short-term, highly liquid investments that are both:  readily convertible to known amounts of cash and so near their maturity that they present insignificant risk of changes in value because of changes in interest rates.  Generally, only investments with original maturities of three months or less qualify under that definition.  Examples of items commonly considered to be cash equivalents are Treasury bills, commercial paper, money market funds, and federal funds sold (for an enterprise with banking operations).
>
> In relation to [the Fund], the first item to discuss is whether [the Fund] is a "highly liquid investment" and therefore can it be classified as a cash equivalent.  Based on the facts that I currently know, it is not "highly liquid" and therefore cannot be considered a cash equivalent and should be classified as an investment.  The second item is whether the [the Fund] investment is collectible and if it is secured or collateralized for this risk, I need to have the details of the collateral arrangements and support.

29.     Isaza Tuzman responded that the Fund's deposits "should be listed as a cash equivalent" because of the collateral provided by the Security Agreement.  The Controller rejected this treatment, telling Isaza Tuzman that "[c]ash collateral is not enough to make it a

cash equivalent.  It is enough to support the value of the investment."

30.     Even knowing that his Controller was uncomfortable treating the deposit as a cash equivalent—even if the Security Agreement was bona fide—Isaza Tuzman never informed the auditors or the Company's investors that the Fund itself was not in a position to repay the Company and that KIT Digital could not actually, as a practical matter, exercise its rights under the purported Security Agreement or obtain its money back within 14 days.

**C.      Despite Knowing That the Fund May Never Repay the Outstanding $2 Million Balance, KIT Digital Falsely Portrayed This Investment as a "Cash Equivalent" on its Books, Records, and in its Commission Filings.**

31.     In Forms 10-K and 10-Q from 2008 through the third quarter of 2011, the Company reported its position in the Fund as a "cash equivalent."  However, treating KIT Digital's lost investment in the Fund as a "cash equivalent" was contrary to the Company's own disclosures and violated U.S. GAAP, because KIT Digital knew (or recklessly disregarded) that it was unable to obtain the return of this money.

32.     KIT Digital—in the financial statements included with each of its Forms 10-K for 2008-2011—defined "Cash and Cash Equivalents" as "all highly liquid investments with original maturities of ninety days or less when purchased[.]"  The Company also disclosed in its Forms 10-K that its investments with the Fund were "guaranteed and backed by liquid collateral instruments, and can be redeemed with 14 days written notice."  However, for reasons set out above, Isaza Tuzman knew (or recklessly disregarded) that these statements were false (or at least highly misleading) because the Fund could not (or would not) return the Company's remaining deposits and Isaza Tuzman understood that attempts to exercise the Company's rights under the Security Agreement would likewise not result in the rapid return of the funds.

33.     Nonetheless, Isaza Tuzman read and signed each relevant Form 10-K and 10-Q. In addition, with respect to each Form 10-K and 10-Q for the relevant periods discussed in this

Complaint, Isaza Tuzman certified that, "[b]ased on my knowledge":

a. "[T]his report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report"; and

b. "[T]he financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this report[.]"

34. As Isaza Tuzman knew (or recklessly disregarded) these certifications were false and misleading with respect to KIT Digital's cash and cash equivalents for the reasons described above.

35. Treating KIT Digital's remaining $2 million investment with the Fund as a "cash equivalent" also violated U.S. GAAP. The Accounting Standards Codification's ("ASC")[1] glossary defines "cash equivalents" as "[s]hort-term, highly liquid investments" that are both: (a) readily convertible to known amounts of cash; and (b) so near their maturity that they present insignificant risk of changes in value because of changes in interest rates. Moreover, "[g]enerally, only investments with original maturities of three months or less qualify . . . ."[2]

36. For the same reasons discussed above, Isaza Tuzman understood (or recklessly disregarded) that KIT Digital's $2 million investment with the Fund met none of these

[1] The ASC is the codification of U.S. GAAP.

[2] The ASC was effective for interim and annual periods ending after September 15, 2009. Prior to that date, the relevant U.S. GAAP standard concerning cash and cash equivalents was Financial Accounting Standard 95 (*FAS 95: Statement of Cash Flows*). FAS 95's definition of cash equivalents was identical to the ASC's for all relevant purposes.

requirements.

37. As a result of the inappropriate classification of its deposits with the Fund, KIT Digital overstated its cash equivalents by approximately $2 million from December 31, 2008, through September 30, 2011. As a result of these misstatements, the Company overstated its cash position by approximately:

c. 50% in the Form 10-K for the year ended December 31, 2008;

d. 40% in the Form 10-K for the year and quarter, respectively, ended December 31, 2009; and

e. 1% in the Form 10-K for the year ended December 31, 2010.

38. In addition, the Company's cash position was misstated in its Forms 10-Q for the quarters ending March 31, 2009 (by 345%), June 30, 2009 (by 251%), September 30, 2009 (by 17%), March 31, 2010 (by 5%), June 30, 2010 (by 3%), September 30, 2010 (by 4%), March 31, 2011 (by 2%), June 30, 2011 (by 5%), and September 30, 2011 (by 3%).

39. In approximately early 2012, the Fund informed the auditors that it would not send a confirmation acknowledging that the Fund owed the $2 million to KIT Digital. When KIT Digital failed to demonstrate to the auditors that it could access the $2 million, the auditors required the Company to report an approximately $2 million loss of impairment on its investment with the Fund in its 2011 Form 10-K, filed on March 30, 2012.

## III. ISAZA TUZMAN HIDES KIT DIGITAL'S PURCHASES OF ITS OWN STOCK

40. In late 2008, Isaza Tuzman arranged with a hedge fund manager ("Hedge Fund Manager") to have the Hedge Fund Manager trade KIT Digital's common stock—using the Hedge Fund manager's own money as well as money provided by KIT Digital and Isaza Tuzman—in order to create the appearance of genuine trading volume and to increase the stock's price. KIT Digital, acting through Isaza Tuzman, hid the fact that the Company, directly and

through affiliated persons, was purchasing its own stock.

41.      On December 31, 2008, Isaza Tuzman and the Hedge Fund Manager agreed that the Hedge Fund Manager would buy approximately $400,000 in KIT Digital common stock and hold it for at least 90 days.  In the two months that followed this agreement, the Hedge Fund Manager purchased approximately $400,000 of KIT Digital stock, which constituted at least 20% of the total trading in KIT Digital stock.  Isaza Tuzman agreed that KIT Digital, directly or indirectly, would compensate the Hedge Fund Manager in consideration for making these purchases of Company stock.

42.      Isaza Tuzman further agreed to invest both KIT Digital's and his own cash with the Hedge Fund Manager on the understanding that the Hedge Fund Manager would use a portion of that money to trade the Company's stock.  This had the (intended) effect of disguising that KIT Digital and its CEO were themselves in the market trading the Company's stock.

43.      From March 2009 through February 2011, KIT Digital deposited $1.15 million in the Hedge Fund Manager's fund.  The Hedge Fund Manager, with Isaza Tuzman's knowledge (or reckless disregard), used $900,000 of that money to trade KIT Digital stock on the open market.  As a result, the Hedge Fund Manager's trading often represented double digit percentages of the Company's total daily trading during the period.

44.      In addition, Isaza Tuzman invested at least hundreds of thousands of dollars of his own money with the Hedge Fund Manager, who used a portion (if not all) of it to trade KIT Digital stock.

45.      The Hedge Fund Manager and Isaza Tuzman repeatedly discussed their agreement to create the false appearance of genuine, market activity in KIT Digital's stock by having the Hedge Fund Manager purchase stock at certain opportune times (using his own

money and the money that KIT Digital and Isaza Tuzman had invested with him).  For example:

   a.   In March 2009, Isaza Tuzman was in negotiations with a company he was

        hoping would acquire KIT Digital.  During those negotiations, Isaza

        Tuzman sent an "[u]rgent" email to the Fund Manager asking him

        "[W]here is the stock right now," a signal to the Fund Manager to

        purchase more shares in order to increase the price and, thus, make the

        acquisition more attractive; shortly after receiving this email, the Fund

        Manager, purchased at least an 300 additional KIT Digital shares (7% of

        the total trading volume for the Company's shares that day).

   b.   In June 2009, alarmed that an investor had just sold a large amount of

        stock on the market (which threatened to lower the Company's stock

        price), Isaza Tuzman again asked the Fund Manager to buy up more

        shares, writing "What is volume so far?  We can't close at 7.35!"  In that

        instance, the Fund Manager responded that "I can't do anymore

        unfort[unately]"; and

   c.   On September 3, 2009—the day that Isaza Tuzman was to ring the closing

        bell at NASDAQ to celebrate KIT Digital's listing—he instructed the

        Fund Manager to purchase KIT Digital stock in order to create the

        appearance of genuine, market demand.  The Fund Manager did as he was

        asked, purchasing 1,000 shares (or approximately 4% of that day's trading

        volume).

   46.   That KIT Digital and the Hedge Fund Manager had agreed to act in concert to

purchase the Company's own stock was never disclosed in any of the Company's filings, even

though such information was required to be disclosed by Item 703 of Regulation S-K. To the contrary, KIT Digital—in each of its Forms 10-K during the relevant time period—stated that it had made no issuer purchases of equity securities.

47. Isaza Tuzman was aware of the agreement with the Hedge Fund Manager having personally negotiated and approved it. He was also aware that the Hedge Fund Manager was using the Company's and Isaza Tuzman's money to trade the Company's stock to increase the volume and/or support the price. Nonetheless, after reviewing the Company's filings, he signed and certified the accuracy of each relevant Form 10-K, knowing (or recklessly disregarding) that the Company's Forms 10-K failed to disclose the agreement or the Hedge Fund Manager's use of the Company's money to trade in the Company's stock.

## IV. IMPROPER ACCOUNTING FOR A NON-EXISTENT SALE

### A. Introduction

48. In mid-2010, Isaza Tuzman, Smyth, and other KIT Digital employees created the false appearance that the Company had delivered an off-the-shelf (and fully-functioning) software product—called VX Manager ("VXM")—to a client ("Client") in June 2010 for nearly $1.5 million. They did so because, under U.S. GAAP, the Company could recognize the sale as revenue in the second quarter of 2010 only if the software product had been fully delivered in that quarter and no significant modifications to that software were necessary.

49. In truth, however, Isaza Tuzman, Smyth, and others at KIT Digital understood that the VXM software product that the Company had promised to deliver to the Client was to be developed and installed over time and that it would be many months before the Company was able to complete delivery of a fully-functioning VXM software. In other words, everyone involved in the transaction understood that the software would not be developed and installed at the end of June 2010.

50. In spring 2011, the auditors began questioning whether the Company had actually delivered VXM in June 2010. In response, Isaza Tuzman and Smyth took efforts to hide the truth (a) that KIT Digital had never intended to deliver VXM to the Client by the end of the second quarter of 2010; (b) that, even by 2011, the Company had been unable to develop the software the Client had agreed to buy; and (c) that, as a result, the Client did not pay anything to the Company.

**B. <u>The VXM Sale</u>**

51. In approximately June 2010, the Client agreed to buy the VXM software for approximately $1.5 million, comprised of software with certain specific capabilities, hardware, and other services (for nearly $1.34 million) and a set-up fee (of $150,000). The Client had been an existing customer of a company that KIT Digital acquired in early 2010 and had purchased from the predecessor company, and was running a different software to stream its video content ("Predecessor Software"). However, the Client wanted to switch to VXM because it had been pitched as a better way for the Client to manage its video content across different platforms.

52. Both parties understood that the version of VXM that the Client was agreeing to buy required significant additional development and installation work to meet the Client's specific needs. In addition, both parties understood that it would be many months before KIT Digital was able to fully develop the VXM software that the Client had agreed to buy and to integrate it with the required hardware (including servers).

53. On June 30, 2010, KIT Digital's Vice President of Strategic Accounts ("Vice President")—the point person for contact with the Client—sent the Client a draft purchase order and a proposal for developing and delivering VXM to the Client. The Vice President wrote that:

> Attached, please find your updated proposal . . . Our team found that there would be expensive development work required to make the server/card combo we recently discussed work. Also, the

> server company is able to work with them [KIT Digital employees] at Kit facilities in Germany to speed integration with VX Manager. They also have a new commitment from the manufacturer of the servers to deliver 25 by the end of September, with the first 10 at 4 weeks. Of course, this delivery clock cannot even start ticking until I get the setup fee from you.

54. The attached proposal further stated that full "deployment" of VXM to the Client "will consist of multiple phases" and "requires unique integration steps." The proposal then described nearly 20 steps that KIT needed to complete to provide the Client with full functionality for VXM and estimated that deployment of the product would commence in August 2010 and be completed by April 2011.

55. Thus, both KIT Digital and the Client understood that KIT Digital needed to undertake significant development and integration work—some of which it could not even start until the Client had paid its setup fee—before it could deliver anything to the Client.

56. The Client sent a signed purchase order to KIT Digital on or about July 2, 2010. That purchase order stated that the Client would pay KIT Digital for the VXM software over a term of 24 months.

### C. KIT Digital Was Not Entitled to Recognize Any Revenue From the Purported Sale of VXM to the Client in the Second Quarter of 2010.

57. KIT Digital did not deliver any portion of the VXM software to the Client by June 30, 2010. Under U.S. GAAP and KIT Digital's own disclosure, the Company was, therefore, not entitled to recognize revenue from the sale of VXM in the second quarter of 2010.

58. Under ASC 985-605-25-3, a company can immediately recognize revenue from the sale of software, "that does not require significant production, modification or customization," if four criteria have been met:

a. Persuasive evidence of an arrangement exists;

b. Delivery of the product has occurred;

    c.      The vendor's fee is fixed or determinable; and

    d.      Collectability is probable.

59.     In addition, in its Forms 10-K for the years 2009-2011, KIT Digital disclosed that it recognized revenue only once "four basic criteria" were met (virtually identical to those required by U.S. GAAP):

> (i) persuasive evidence that an arrangement exists; (ii) the price is fixed or determinable; (iii) collectability is reasonably assured; and (iv) product delivery has occurred or services have been rendered.

60.     As of June 30, 2010, the Company had not delivered anything to the Client.

61.     Moreover, the VXM software needed significant production, modifications, or customization after June 30, 2010.  Indeed, the parties explicitly anticipated that it would take nearly a year for KIT Digital to complete development, installation, and integration of VXM with the Client's systems.  In these circumstances, a different accounting standard applied.

62.     Under ASC 985-605-25-2, "[i]f an arrangement to deliver software or a software system, either alone or together with other products or services, requires significant production, modification, or customization of software," KIT Digital was required to apply "contract accounting" to the sale.  In such situations, it was KIT Digital's revenue recognition policy to recognize revenue only as certain milestones in the development, delivery, and installation of the software were achieved.  The revenue would then be recognized incrementally with the entire fee not fully recognized until all milestones had been delivered.

63.     Thus, under U.S. GAAP and KIT Digital's own disclosures, the Company was not entitled to recognize any revenue from the sale of VXM to the Client in the second quarter of 2010 because (a) it had not delivered any of the VXM product; and (b) delivery was, in any event, to be spread out over many months.

### D. KIT Digital Created the False and Misleading Appearance That It Had Completed Delivery of VXM to the Client in June 2010 in Order to Immediately (but Improperly) Recognize Nearly $1.34 Million in Revenue.

64. To create the false appearance that KIT Digital was entitled to recognize such revenue in the second quarter of 2010, KIT Digital deceived the auditors into believing that it had fully delivered the VXM software to the Client before the end of June 2010 and had otherwise met the criteria to recognize the software sale as revenue.

65. In mid-July 2010, one of Smyth's subordinates informed the Vice President that the Company needed to obtain "[p]roof of Customer acceptance of the delivery at or prior to June 30th . . ." (elliptical in original). The reason for this was to create the false appearance that KIT Digital had completed delivery in time to recognize revenue from the sale in the 10-Q for the quarter ended June 30, 2010.

66. In early August 2009, Smyth instructed the Vice President to ask the Client to state in writing that KIT Digital had already delivered VXM.

67. First, the Vice President emailed the Client that "[w]e have a swarm of auditors in Prague and it seems I still need for you to reply to some emails. No signatures needed." The Vice President then explained that, as a result, he would be sending another email "requesting confirmation that your software license was delivered in June. 'Delivered' is the operative word and is subjective. Will simply need you to respond with 'Yes'."

68. A few days later Smyth instructed the Vice President to get the Client to sign a letter addressed to KIT Digital. Smyth provided the Vice President with the language he wanted in that letter, which stated:

> We hereby confirm that the software according to the Purchase Order dated June 18, 2010 by and between Kit Digital, Inc. and [the Client] has been delivered on June 22, 2010.

69. Smyth asked that the Client simply copy and paste this language onto the Client's

letterhead.

70. Smyth knew (or recklessly disregarded) that this letter was false for the simple reason that he knew (or recklessly disregarded) that KIT Digital had not delivered—indeed, could not deliver and had not agreed to deliver—VXM to the Client by June 30, 2010. In addition, Smyth received an earlier draft of the purchase order, which stated that KIT Digital would start delivery of the VXM software suite only in August with "[i]ntegration of all components" to occur "within the timeline as outlined in the attached DEPLOYMENT Technology License." This fact alone was sufficient to put Smyth on notice that KIT Digital had not completed (indeed, had not begun) delivery of VXM by June 30, 2010. Moreover, in mid-July 2010, one of Smyth's subordinates emailed him a draft of a new purchase order, eliminating any discussion of phased deployment, and wrote that this version "contains the right wording to be included as an instant sale."

71. At the same time as he was asking the Client to make the false delivery representation, the Vice President—at Smyth's direction and using language he provided—also asked the client to sign another letter falsely stating that the parties had originally agreed to a twelve-month payment plan. In addition, the Vice President asked the Client to state that the signing of the original purchase order, setting out the 24-month payment terms, had been done in error. Specifically, the Vice President asked the Client to prepare a letter, addressed to KIT Digital, stating that:

> [T]his is to confirm that we rescind the contract and have reverted back to the original payment plan for the software.
>
> At the time of signing the vendor financing agreement did not take into consideration certain implications around the agreement and our internal approval process was not followed. Hence, we did not have the appropriate authority to proceed, and the contract would, in our view, not have been enforceable.

> We appreciate your efforts to assist us in the implementation of the original agreed-upon payment program.
>
> . . .
>
> By countersigning below, KIT Digital acknowledges that the vendor financing agreement was never in force and is forever null and void, and that our original plan above [setting out four quarterly payments to be completed by May 31, 2011] is agreed by both parties.

72. This letter was untrue. The parties had initially agreed that the Client would pay for VXM over 24 months as reflected in the purchase order that the Client sent to KIT Digital on or about July 2, 2010. It was also untrue that the Client did not follow its internal approval process or that it did not have the authority to proceed on the original purchase order (the contract referenced in the letter).

73. The truth was that Smyth was trying to convince the auditors that the parties' true agreement had always been that the Client would fully pay for the VXM software within 12 months. This was because days before Smyth asked for the above letter, the auditors told Smyth that KIT Digital may not be able to recognize revenue for the sale of VXM in the second quarter of 2010 unless the Client was going to pay for VXM in 12 months (or less). In an email, the auditor told [Smyth] "Since the payment terms are over 2 years par. 28 [of SOP-97-2, the relevant software accounting standard before the ASC was implemented] indicates that the fee may not be fixed or determinable." The auditor also provided Smyth with the relevant language from SOP-97-2 (identical to the accounting discussed the next paragraph).

74. The auditor's advice correctly reflected U.S. GAAP. As [Smyth] knew or recklessly disregarded, under ASC 985-605-25 (identical to SOP-97-2 in this regard) the price of the sale of software license is presumed not to be "fixed or determinable" (thus, barring revenue recognition) if payment extends beyond 12 months:

> [A]ny extended payment terms in a software licensing arrangement may indicate that the fee is not fixed or determinable. Further, if payment of a significant portion of the software licensing fee is not due until after expiration of the license or more than 12 months after delivery, the licensing fee shall be presumed not to be fixed or determinable.

75. Nonetheless, the Client complied with Smyth's and the Vice President's requests, signing both letters. Isaza Tuzman countersigned the letter purporting to "revert[]back to the original payment plan for the software" of four quarterly payments.

76. The parties also executed a new purchase order that did not include any references to phased deployment of the software and setting out the one-year payment schedule.

77. The Client then either delivered the letter confirming delivery directly to KIT Digital's auditors or sent the letter to KIT Digital, which in turn provided it to their auditors.

78. At Isaza Tuzman's request, a Company employee sent the new purchase order and the letter falsely claiming that the parties initially agreed to a one-year payment schedule to the auditors.

79. Company employees repeatedly discussed the need for such recognition with Smyth throughout July and August 2010. For example, in July 2010, one of Smyth's subordinates sent an email to Smyth, the Vice President, and other executives discussing the need to make sure that the Client's purchase order "contains the right wording to be included as an instant sale." Later that same month, she sent another email to Smyth, the Vice President, and others, expressing concern that the purchase order not contain language that would "jeopardize the instant sale." Smyth and the Vice President both understood these emails to be references to ensuring that KIT Digital could recognize revenue from the sale in the second quarter of 2010.

80. Isaza Tuzman likewise understood (or recklessly disregarded) that the VXM software suite had not been fully delivered to the Client in June 2010. In early August 2010,

before the Company issued its second quarter 2010 Form 10-Q, Isaza Tuzman was informed by email that hardware necessary for the VXM software installation had not been delivered to the Client and that challenges existed to delivering VXM.

81. Moreover, both Smyth and Isaza Tuzman knew (or recklessly disregarded) that KIT Digital should not recognize revenue for the VXM software in the second quarter of 2010 because it had not delivered any of that software by June 30, 2010. Smyth was the Company's principal accounting officer and was, therefore, knowledgeable about the relevant accounting rules. For example, he plainly understood that delivery was an important element in revenue recognition, as demonstrated by his request that the Client sign the false delivery letter. In addition, Smyth engaged in discussions with his staff and the auditors about the necessary methods for recognizing revenue in the second quarter of 2010. In addition, both Smyth and Isaza Tuzman read KIT Digital's 2009 Form 10-K, which (as discussed above) stated that the Company recognized revenue only after delivery.

**E. <u>KIT Digital's Form 10-Q for the Quarter Ended June 30, 2010</u>**

82. On August 16, 2010, KIT Digital issued its Form 10-Q for the quarter ending June 30, 2010. Isaza Tuzman and Smyth each read, signed, and certified the accuracy of the Form 10-Q.

83. Despite not having actually delivered any of the VXM software to the Client, KIT Digital recognized nearly $1.34 million as revenue (all but the $150,000 set-up fee) from the sale of VXM software in the Form 10-Q. In improperly recognizing this revenue, KIT Digital increased its reported revenue for the second quarter by over 6% and reduced its reported before-tax losses by more than 70%.

84. The VXM software sale to the Client was an important development for Isaza Tuzman and Smyth. In a press release dated August 16, 2010—which both Defendants reviewed

and authorized—touting its "Record Second Quarter 2010 Results," KIT Digital called the sale of VXM software to the Client a "Client Win". This was because the sale was not only large from a financial standpoint, but also demonstrated that the Company was able to execute on its strategy of providing software that allowed for high-quality streaming video across different devices.

85. That same day, KIT Digital corporate officers (including Isaza Tuzman and Smyth) led a conference call with investors. On that call, KIT Digital's then-President further touted the Company's revenue-driven growth and, specifically, pointed to KIT Digital's ability to sell new products to clients (including the Client) of companies that KIT Digital had acquired:

a. "Our good financial performance in Q2 was a result of our ongoing and aggressive focus on revenue growth . . .";

b. "Our second quarter performance also reflects our ability to capitalize on upselling and cross-selling opportunities to the client bases of previously acquired companies"; and

c. Again pointed to the VXM sale as a "win" for the quarter.

86. In all of these public statements, Isaza Tuzman Smyth knowingly (or recklessly) disregarded that (a) KIT Digital had not delivered the VXM software to the Client; and (b) that it was, therefore, improper for KIT Digital to recognize revenue from the VXM software sale.

87. To highlight the significance of the purported VXM software sale to his staff, Isaza Tuzman threw a Company party in Prague to honor the Vice President for making the sale.

**F. <u>KIT Digital Was Not Able to Develop the VXM Software.</u>**

88. Throughout the remainder of 2010, KIT Digital encountered serious problems deploying the VXM software to the Client as promised. KIT Digital was able to deliver some servers (from which the Client would, in theory, run the VXM software), but was not able to

develop—and, therefore, deliver to the Client—a working version of VXM.

89.     Throughout 2010 and 2011, the Client repeatedly told KIT Digital that it had not delivered the product as promised.  Moreover, the Client repeatedly told KIT Digital employees that it would not pay for any of the product until the entire working VXM software suite had been delivered.

90.     As early as September 2010, the Vice President was expressing concern about the serious problems the Company was facing in making VXM work.  At the end of that month, he sent a memo to his superior discussing that KIT Digital had been unable to deliver VXM because it was facing problems with making the software product function as promised.  He wrote (a) that the Client was "complaining about delivery"; (b) that "[t]o date, almost no measurable capability exists" for VXM; (c) that KIT Digital was still developing aspects of VXM, for which the Client "had as primary need"; and (d) that the "first station install is weeks behind schedule."

91.     Both Isaza Tuzman and Smyth were kept abreast of the development problems throughout the fall and winter of 2010.  For example, in October 2010, the Vice President told Isaza Tuzman and Smyth that "[w]e have been slow to deploy against our promises[.]"  That same day a Company officer emailed Isaza Tuzman that "we are behind on deployment" and that, because of problems with developing VXM, he wanted to look into providing the Client with a different software product entirely.  By late December 2010, Company employees were telling Isaza Tuzman that the Client was considering cancelling the deal and that it was withholding payment because of the Company's inability "to deliver ANY software functionality."

92.     Indeed, before the end of 2010, KIT Digital's management (including Isaza Tuzman) had determined that the Company would be unable to deliver the VXM software at all

because of development problems. Instead, Isaza Tuzman and other Company officers decided to try to sell the Client on a different product in lieu of VXM software.

93. During the first few months of 2011, the Company's executives (including the Vice President and Isaza Tuzman) continued to discuss KIT Digital's inability to make VXM work or to deliver as promised to the Client.

**G. KIT Digital Sells 8 Million Shares of Common Stock to the Public.**

94. On or about October 13, 2010, KIT Digital issued (and filed with the Commission) a Form S-3 Registration Statement in connection with its offering of $250,000,000 of common stock. Isaza Tuzman and Smyth signed the Form S-3. The financial statements filed with the Form S-3 incorporated in full the previously reported revenue from the purported sale of VXM software to the Client.

95. From November 19, 2010 to November 24, 2010, KIT Digital sold 8 million shares of common stock pursuant to this Form S-3.

96. At the time that Isaza Tuzman and Smyth signed the Form S-3 they knew (or recklessly disregarded): (a) that KIT Digital had not delivered the VXM software in the second quarter of 2010; (b) that KIT Digital was having trouble developing the VXM and was behind schedule on delivery to the Client; and (c) that the purported sale was, therefore, in doubt and, at least, had not occurred in June 2010 as advertised. In addition, both Isaza Tuzman and Smyth knew (or recklessly disregarded) that the Client was withholding payments (and, to date, had not made the first quarterly payment due under the purchase order).

**H. KIT Digital Issued its Form 10-K for the Year Ended December 31, 2010.**

97. On or about March 16, 2011, KIT Digital issued its Form 10-K and attendant financial statements for the year ended December 31, 2010. KIT Digital recognized as revenue the entire amount of the VXM purchase order (of nearly $1.5 million).

98. Again, Isaza Tuzman and Smyth read, signed, and certified the accuracy of the Form 10-K and financial statements. By this point, however, there could be little doubt in Defendants' minds that KIT Digital had not delivered (indeed, could not deliver) VXM as promised, and, as a result, the Company should not have recognized revenue from the purported sale.

**I. Isaza Tuzman and Smyth Hid Kit Digital's Failure to Deliver the VXM Software from the Auditors.**

99. In April 2011, the auditors informed Smyth that the Client had sent them written confirmations saying that KIT Digital had not, in fact, delivered the VXM software. The auditors further told Smyth that, because the Purchase Order amount was material, they needed to resolve "whether there was an issue as of year-end or in Q1 with collectability, and also clear whether installation was completed."

100. In response to this query, Isaza Tuzman and Smyth determined to fool the auditors into thinking that KIT Digital had delivered the VXM software as promised, although they understood (or recklessly disregarded) that this was not true.

101. In early May 2010, Isaza Tuzman emailed the auditors (copying Smyth) assuring them that KIT Digital had delivered VXM. He wrote that "the video service has been live since last year. Impossible if it 'hadn't been delivered'."

102. The next day, the Vice President sent another email to Isaza Tuzman detailing exactly how dire the situation was with respect to delivering VXM to the Client. He wrote that "our best efforts to turn this sinking ship around appear to have failed", that KIT Digital had not been able to deliver a software product that the Client could use, and that, as a result, the Client was "working at deploying an alternative solution" from a different vendor.

103. The next day, the auditors wrote back to Isaza Tuzman and Smyth that they

needed to resolve this issue quickly and "[t]hat this is a very serious matter impacting the revenue recognition on this contract . . . ."

104. Instead of coming clean about the true state of VXM, however, Isaza Tuzman approached the Client to provide another false confirmation to the auditors that delivery had occurred. In an email discussion with Isaza Tuzman, the Client made this plain, writing "I read the audit letters and . . . [the Client's] response," saying that VXM had not been delivered, "and now have a clear understanding of what was said. Based upon these letters your audit firm is looking for us to acknowledge and confirm that we owe $1,488,882 for the Kit solution, a solution that hasn't yet been delivered. What language is needed to support your position at your meeting?" This time, however, the Client did not prepare another false letter for the auditors.

105. However, because Isaza Tuzman had told the auditors that the video streaming service on the Client's website was being run on VXM, the auditors believed that KIT Digital had delivered the software as represented. This was not true. As Isaza Tuzman and Smyth knew—but failed to tell the auditors—(a) the "video service" used on the Client's website was being run on the Predecessor Software, not VXM; and (b) KIT Digital had not been able to deliver working VXM software to the Client.

106. Over the course of spring and summer 2011, Isaza Tuzman, Smyth, and other Company executives continued to discuss the fact that KIT Digital had been unable to develop or deliver VXM to the Client as agreed and discussed different possibilities for developing and deploying a different software that would meet the Client's needs by the end of 2011.

107. In addition—as the one-year anniversary of the purported sale of VXM approached—Isaza Tuzman and Smyth became increasingly concerned that KIT Digital would need to write down the VXM sale on its financial statements because the Client had not paid for

VXM within the 12-month timeframe set out by the auditors in August 2010.

108. On June 1, 2011, Smyth reminded Isaza Tuzman how important it was that KIT Digital receive payment from the Client by the end of that month:

> As you are aware we need to solve for [the Client]. This pertetual [sic] license for $1.38 mil went into revenue Q2 last year which means it needs to be paid within 12 months (by end of June) to keep in revenue. It will create other credibility issues for other outstanding license deals with auditors if this is not solved. Can we get on a call to discuss an action plan.

109. This concern prompted several weeks of efforts by Isaza Tuzman to persuade the Client's CEO to pay KIT Digital. However—because KIT Digital had not actually delivered the VXM software per the agreement—the Client continued to refuse to make any payments.

110. Isaza Tuzman and Smyth, therefore, resolved to create the appearance that the Client was paying KIT Digital for its delivery of VXM software.

111. In late June 2011, Isaza Tuzman directed Smyth to draft a document by which the Client would purportedly receive a loan from a third-party lender, and then use these funds to pay KIT Digital.

112. Smyth drafted a loan agreement between the Client and a British Virgin Islands entity (the "Entity"), from which the Client was to borrow over $1.5 million. Under the terms of the loan agreement, the Entity would send the money directly to KIT Digital via an escrow agent in Dubai ("Escrow Agent"). The loan agreement provided that the Client would not need to repay the loan until an unspecified future "Product Delivery." In other words, the Client was never itself liable to repay the loan unless the Company was able to deliver the required software (something that KIT Digital had, to date, been unable to do).

113. On August 4, 2011, the Escrow Agent wired $1.53 million KIT Digital. As Defendants knew (or recklessly disregarded), KIT Digital never delivered working VXM

software to the Client and, as a result, the Client never paid any amount outstanding on this loan.

114. The purpose of this dubious loan transaction was to enable the Company to disguise from its auditors that (a) KIT Digital had never delivered a working product to the Client; and (b) that the Client was unwilling to make any payments.

### J. Kit Digital's Form 10-Q for Second Quarter 2011.

115. On August 9, 2011, KIT Digital filed its Form 10-Q for the quarter ending June 30, 2011. Isaza Tuzman and Smyth read, signed, and certified the accuracy of this Form 10-Q. As both Isaza Tuzman and Smyth knew or recklessly disregarded, the June 30, 2011 Form 10-Q contained the June 30, 2010 overstatement of revenue and was, thus, materially false and misleading.

116. At no point did Defendants undertake any efforts to correct any of the false or misleading statements described above.

## V. THE SEZMI TRANSACTION

117. In late 2011, Isaza Tuzman and Smyth undertook an elaborate plan to create the false appearance that the Company had received payments on accounts receivables for sales previously recorded and on an outstanding debt owed to KIT Digital for which it was never actually paid.

118. They accomplished this fraud by announcing that KIT Digital would use $7.85 million in cash to acquire a company called Sezmi Corporation ("Sezmi") and then—contrary to its disclosures—funneling the money to a number of its customers and other debtors. These customers, in turn, "paid" the funds over to KIT Digital, which then falsely recorded these payments (a) to reduce outstanding accounts receivables for previous sales of its products, and (b) to reflect repayment on an outstanding debt owed to KIT Digital.

119. This fraud had the effect of materially overstating the Company's goodwill and

materially understating its losses for the year ended December 31, 2011.

**A. <u>The Sezmi Acquisition and Press Release.</u>**

120. On or about January 6, 2012, KIT Digital announced the Sezmi acquisition in a press release and Form 8-K, which Isaza Tuzman signed. In that release, KIT Digital further announced that it was paying for the acquisition through a combination of stock, assumption of Sezmi's liabilities, and $8 million in cash payments:

> This consideration consisted of approximately $8 million of cash paid at closing plus the assumption of approximately $8 million in cash liabilities . . . and the issuance of an estimated $11 million in KIT [D]igital common stock . . . .

121. However—as both Isaza Tuzman and Smyth understood (or recklessly disregarded)—Sezmi's owners would never receive any portion of the nearly $8 million.

122. KIT Digital and Sezmi entered into an Asset Purchase Agreement on or about December 30, 2011. This agreement provided that KIT Digital would pay "Cash Consideration" of $7,850,000 at the acquisition's closing.

123. At the same time, however, Smyth and Sezmi also entered into a separate Letter Agreement. The Letter Agreement provided that the entire $7,850,000 Cash Consideration would never actually be paid over to Sezmi's shareholders. Instead, the Letter Agreement earmarked those funds to cover KIT Digital's "Post-Acquisition Integration costs," and further stated that Sezmi "shall have no claim to the Reserve Funds under any circumstances unless explicitly granted by KIT at its sole election."

124. The Letter Agreement was never disclosed to the investing public or to KIT Digital's auditors. Indeed, Isaza Tuzman and Smyth had already determined to keep any references to the post-acquisition integration costs out of the Asset Purchase Agreement so that the auditors would not become aware of this provision. The reason for this secrecy was because

Isaza Tuzman and Smyth did not plan to use this nearly $8 million in connection with the Sezmi transaction as announced or even for post-acquisition costs as set out in the Letter Agreement. Instead, Isaza Tuzman and Smyth planned to create an off-the-books slush fund that would allow them to create the false appearance that KIT Digital was being paid for products that it had sold.

**B. Kit Digital Used the Cash Consideration to Fund Round-Trip Transactions that Enabled the Company to Report Fictitious Payments on its Accounts Receivable, Other Debts Owed to the Company, and Other Expenses.**

125. In mid-December 2011, before the acquisition of Sezmi closed, the Company wired $7.85 million to a Cyprus entity, which it had designated as the escrow agent for the $7.85 million. On or about December 27, 2011, Smyth sent an escrow release letter to the Cyprus entity by which he directed that the entire $7.85 million be distributed to parties other than Sezmi or its shareholders, including: (a) $2,600,000 to an entity in the British Virgin Islands; (b) $2,648,000 to a company in London; (c) $950,000 to a company in Cyprus; (d) $452,000 to a former KIT Digital subsidiary, which owed KIT Digital more than $9 million; and (e) $1.2 million to KIT Digital's attorney.

126. At approximately the same time, Smyth and Isaza Tuzman discussed plans to transfer these funds to the various parties.

127. Two days later, on December 29, 2011, the former KIT subsidiary wired $439,379 of this money back to KIT Digital. The former subsidiary's bank statement indicated that the wire was for November and December "installments" on its debt to KIT Digital. KIT Digital, in turn, improperly recorded these payments on its books as a reduction of the company's loan receivables.

128. That same day, the British Virgin Islands-, London-, and Cyprus-based companies wired $4.39 million back to KIT Digital on behalf of three purported customers, each of which owed money to KIT Digital under software agreements. KIT Digital recorded these payments to

reduce all or a portion of those customers' outstanding accounts receivable. However, in reality (and with the knowledge or reckless disregarded of Smyth and Isaza Tuzman), these companies were simply returning a portion of the money the Company had sent them days prior.

### C. The Scheme Resulted in a Number of Materially False and Misleading Statements.

129. Defendants' fraudulent scheme to redirect payments reportedly to be used for the acquisition culminated in the Company making a number of materially false public statements concerning its financial condition.

130. The January 6, 2012 Form 8-K discussed above (a) falsely reported that the purchase price of Sezmi was approximately $27 million, including approximately $8 million of cash; (b) attached the Asset Purchase Agreement between KIT Digital and Sezmi, which likewise created the false and misleading appearance that KIT Digital was paying Sezmi nearly $8 million in cash consideration; and (c) did not disclose that KIT Digital was, in fact, using the cash consideration to pay off Company expenses and create the false appearance that KIT Digital was being paid for old receivables.

131. By falsely representing the $7.85 million was part of the purchase price, KIT Digital (a) overstated its goodwill on its balance sheet by $7.85 million (or 3%) and (b) understated its losses before taxes in its income statement by the same amount (or 24%). These material misstatements, in turn, were reported in the Company's Form 10-K for the year-end 2011, issued in March 2012.

132. Defendants reviewed, signed, and certified the accuracy of the 2011 Form 10-K. Moreover, as they were aware of the scheme to create the slush fund, as described above, and, in Smyth's case, directed the payments, Defendants likewise knew (or recklessly disregarded) that these statements about the acquisition and payments on accounts receivable were materially false

and misleading and that the scheme was otherwise deceptive.

## VI.   ISAZA TUZMAN AND SMYTH BENEFITED FROM THEIR FRAUDULENT CONDUCT

133.    In 2010 and 2011, Isaza Tuzman was awarded cash bonuses for achieving operational and strategic milestones, was paid incentive compensation, and received performance-based stock.  Isaza Tuzman, directly or through companies he controlled, also sold stock for millions of dollars during the relevant period.

134.    During the relevant time period, Smyth was also awarded a cash bonus and performance-contingent stock.

## VII.   KIT DIGITAL DECLARES BANKRUPTCY

135.    In 2012, KIT Digital's fraud began to come to light.

136.    Defendants resigned from the Company in spring 2012.

137.    After the close of trading on November 21, 2012, KIT Digital filed a Form 8-K announcing that the Company's audit committee had concluded that, because of errors and irregularities in the Company's historical financial statements, the Company would restate financial statements for (i) the years ended December 31, 2009, 2010 and 2011; (ii) each of the three quarters in 2009, 2010 and 2011; and (iii) the quarters ended March 31, 2012 and June 30, 2012.  The Company further said that "investors should no longer rely upon the Company's previously issued financial statements for these periods, any earnings releases or other communications relating to these periods . . . ."

138.    These disclosures had a profound effect on KIT Digital's shareholders.

139.    On November 21, 2012, Kit Digital's stock closed at $2.07 per share.  On November 23, 2012, the first trading day after the prospective restatement was announced, KIT Digital's stock opened at $1.00 per share, a nearly 52% drop.  By the end of that day's trading

the stock had moved down to $0.74 cents per share, an additional 26% decrease.

140. On December 4, 2012, the Listing Qualifications Department of NASDAQ notified KIT Digital that—because of its inability to file timely a Form 10-Q with the Commission—the Company was not in compliance with NASDAQ rules and, as a result, KIT Digital's common stock was subject to being de-listed from NASDAQ. On December 12, 2012, NASDAQ halted trading in the Company's common stock. On January 10, 2013, NASDAQ delisted KIT Digital's common stock.

141. KIT Digital filed for bankruptcy protection under Chapter 11 of the U.S. Bankruptcy Code on or about April 25, 2013.

142. By failing to ensure that KIT Digital's public filings, financials statements, and press releases were accurate, as described above, Defendants failed to act as reasonably careful corporate officers would in similar circumstances.

**FIRST CLAIM FOR RELIEF**

**Violations of Section 17(a) of the Securities Act**

143. The Commission re-alleges and incorporates by reference herein each and every allegation contained in paragraphs 1 through 142 herein.

144. Defendants Isaza Tuzman, in the offer or sale of securities, knowingly, recklessly, or negligently, by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly:

(a) employed devices, schemes or artifices to defraud;

(b) obtained money or property by means of untrue statements of material facts, or omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were

made, not misleading; and/or

(c) engaged in transactions, practices or courses of business which operated or would operate as a fraud or deceit upon the purchaser.

145. By engaging in the foregoing conduct, Defendants violated and, unless restrained and enjoined, will continue violating Securities Act Section 17(a). [15 U.S.C. § 77q(a)].

**SECOND CLAIM FOR RELIEF**

**Violations of Section 10(b) of the Exchange Act and Rule 10b-5 Thereunder**

146. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 142 herein.

147. By engaging in the conduct described above, Defendants knowingly or recklessly, in connection with the purchase or sale of securities, directly or indirectly, by the use of means or instruments of transportation or communication in interstate commerce or by the use of the mails, or the facilities of a national securities exchange:

(a) employed devices, schemes, or artifices to defraud;

(b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or

(c) engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon any person.

148. By engaging in the foregoing conduct, Defendants violated and, unless restrained and enjoined, will continue violating Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## THIRD CLAIM FOR RELIEF

**Violations of Section 13(b)(5) of the Exchange Act**

149. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 142 herein.

150. By reason of the conduct alleged above, Defendants knowingly circumvented or knowingly failed to implement a system of internal accounting controls or knowingly falsified books, records, and accounts of KIT Digital that were subject to Section 13(b)(2) of the Exchange Act. [15 U.S.C. §13(b)(2)(A)].

151. By reason of the foregoing, Defendants violated and, unless restrained and enjoined, will continue violating Section 13(b)(5) of the Exchange Act [15 U.S.C. § 78m(b)(5)].

## FOURTH CLAIM FOR RELIEF

**Violations of Rule 13b2-1 promulgated under the Exchange Act**

152. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 142 herein.

153. By reason of the conduct alleged above, Defendants, directly or indirectly, falsified or caused to be falsified, books, records, or accounts described in Section 13(b)(2)(A) of the Exchange Act. [15 U.S.C. §13(b)(2)(A)].

154. By reason of the foregoing, Defendants violated and, unless restrained and enjoined, will continue violating Rule 13b2-1 promulgated under the Exchange Act. [17 C.F.R. § 240.13b2-1].

## FIFTH CLAIM FOR RELIEF

**Violations of Rule 13b2-2 promulgated under the Exchange Act**

155. The Commission re-alleges and incorporates by reference every allegation contained in paragraphs 1 through 142 herein.

156. Defendants, directly or indirectly, made or caused to be made, materially false or misleading statements or omitted to state, or caused others to omit to state, material facts necessary in order to make statements made, in light of circumstances under which they were made, not misleading, to an accountant in connection with an audit, review, or examination of financial statements or the preparation or filing of a document or report required to be filed with the Commission.

157. By reason of the foregoing, Defendants violated and, unless restrained and enjoined, will continue violating Rule 13b2-2 of the Exchange Act [17 C.F.R. § 240.13b2-2].

## SIXTH CLAIM FOR RELIEF

**Violations of Rule 13a-14 of the Exchange Act**

158. The Commission re-alleges and incorporates by reference every allegation contained in paragraphs 1 through 142 herein.

159. Defendants signed certifications included with KIT Digital's Commission filings. Defendants falsely certified among other things, that (a) the reports did not contain any untrue statements of a material fact or omit to state a material fact necessary to make the statement not misleading; (b) that the financial statements and other financial information included in the reports fairly presented in all material respects the financial condition, results of operations, and cash flows of KIT Digital, and (c) they designed or caused to be designed effective disclosure controls and procedures.

160. By reason of the foregoing, Defendants violated and, unless restrained and enjoined, will continue violating Rule 13a-14 of the Exchange Act [17 C.F.R. § 240.13a-14].

## SEVENTH CLAIM FOR RELIEF

### Aiding and Abetting Violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act

161. The Commission re-alleges and incorporates by reference each and every allegation in paragraphs 1 through 142 herein.

162. By reason of the conduct alleged above, KIT Digital failed to make and keep books, records, and accounts that, in reasonable detail, accurately and fairly reflected its transactions and disposition of assets.

163. By reason of the conduct alleged above, KIT Digital failed to devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that transactions were recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles, or any other applicable criteria, and to maintain accountability for assets.

164. By reason of the conduct alleged above, KIT Digital violated Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

165. Defendants knowingly or recklessly provided substantial assistance to KIT Digital in the commission of these violations of Sections 13(b)(2)(A) and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

166. By reason of the foregoing, Defendants aided and abetted, and unless restrained and enjoined will continue aiding and abetting, KIT Digital's violations of Sections 13(b)(2)(A)

and 13(b)(2)(B) of the Exchange Act [15 U.S.C. §§ 78m(b)(2)(A) and 78m(b)(2)(B)].

## EIGHTH CLAIM FOR RELIEF

### Aiding And Abetting Violations of the Reporting Provisions of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13

167. The Commission re-alleges and incorporates by reference every allegation contained in paragraphs 1 through 142 herein.

168. By filing with the Commission materially false and misleading periodic reports, including annual, quarterly, and current reports on Forms 10-K, 10-Q, and 8-K from 2008 through 2012, KIT Digital violated Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 [15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

169. Defendants knowingly or recklessly provided substantial assistance to KIT Digital's reporting violations as set out in the above paragraph.

170. By reason of the foregoing, Defendants aided and abetted, and unless restrained and enjoined will continue aiding and abetting, KIT Digital's violations of Section 13(a) of the Exchange Act and Rules 12b-20, 13a-1, 13a-11, and 13a-13 [15 U.S.C. § 78m(a) and 17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-11, and 240.13a-13].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter a final judgment:

(a)        finding that Defendants violated the securities laws and rules promulgated thereunder as alleged against them herein;

(b)        permanently restraining and enjoining Defendants, their agents, servants, employees and attorneys and all persons in active concert who receive actual notice of the

injunction, and each of them from, directly or indirectly, violating or aiding and abetting

violations of Section 17(a) of the Securities Act [15 U.S.C. § 77q(a)] and Sections 10(b), 13(a),

13(b)(2)(A), 13(b)(2)(B), and 13(b)(5) of the Exchange Act [15 U.S.C. §§ 78j(b), 78m(a),

78m(b)(2)(A), 78m(b)(2)(B), and 78m(b)(5)] and Rules 10b-5, 12b-20, 13a-1, 13a-11, 13a-13,

13b2-1, and 13b2-2 [17 C.F.R. §§ 240.10b-5, 240.12b-20, 240.13a-1, 240.13a-11, 240.13a-13,

240.13b2-1, and 240.13b2-2], promulgated thereunder;

       (c)     permanently barring Defendants from acting as an officer or director of any public

company pursuant to Section 20(e) of the Securities Act [15 U.S.C. § 77t(e)] and Section

21(d)(2) of the Exchange Act [15 U.S.C. § 78u(d)(2)];

       (d)     directing Defendants to disgorge all ill-gotten gains plus pre-judgment interest

thereon;

       (e)     directing Defendants to pay appropriate civil monetary penalties pursuant to

Section 20(d) of the Securities Act [15 U.S.C. § 77t(d)] and Section 21(d)(3) of the Exchange

Act [15 U.S.C. § 78u(d)(3)];

(f) granting such other and further relief as the Court may deem just and proper.

Dated: September 8, 2015
New York, New York

SECURITIES AND EXCHANGE COMMISSION

Andrew M. Calamari
Regional Director
Sanjay Wadhwa
Adam S. Grace
Alexander Janghorbani
Kristine M. Zaleskas
Attorneys for Plaintiff
SECURITIES AND EXCHANGE COMMISSION
New York Regional Office
200 Vesey Street, Suite 400
New York, New York 10281-1022
(212) 336-0177 (Janghorbani)
Email: JanghorbaniA@sec.gov